Laura **MARTINEZ**, as administratrix of the Estate of Hoyt B. Dixon, Deceased, et al., Plaintiffs,

v.

## PUERTO RICO MARINE MANAGEMENT, INC., Defendant.

Laura **MARTINEZ**, as administratrix of the Estate of Denny L. Jones, Deceased, et al., Plaintiffs,

v.

## PUERTO RICO MARINE MANAGEMENT, INC., Defendant.

Civ. A. Nos. CV–87–0147–B, CV–87–0148–B.

United States District Court, S.D. Alabama, S.D.

May 17, 1990.

Ross M. Diamond, III, Diamond, Hasser & Frost, Ray M. Thompson, Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, Ala., for plaintiffs.

Joseph M. Allen, Jr., Gregory C. Buffalow, David Peeler, Johnstone, Adams Law Firm, Mobile, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUTLER, District Judge.

Hoyt Dixon and Denny Jones died at sea during an attempt by the crew of the SS PONCE to rescue them from their shrimp boat, the JOAN J II. A three-day bench trial produced an array of deposition witnesses, live testimony, documents, exhibits, photographs and records to support the parties' positions. The Court has considered all of the evidence as well as pre- and post-trial briefs and finds that the Defendant Puerto Rico Marine Management, Inc. (PRMMI), operator of the SS PONCE and employer of her officers and crew, was at fault in causing the deaths of Dixon and Jones and that the decedents were not guilty of comparative negligence, and affixes plaintiffs' damages, all as specifically set out as follows.

### FINDINGS OF FACT [1]

Hoyt Dixon and Denny Jones, citizens of Honduras, set out across the Gulf of Mexico from Bayou La Batre, Alabama to Roatan, Honduras in their 76–foot shrimp boat,

---

1. In its order granting summary judgment in favor of defendants Steiner Shipyards, Inc. and Viking Boats, Inc., the Court made additional findings of fact which need not be repeated here.

the JOAN J II (hereinafter JOAN J), on March 11, 1986. What began as an uneventful crossing with relatively calm seas changed about 270 miles out when their boat began taking on water through the bow. They made the decision to return to Bayou La Batre to get repairs done and also in order to have a following sea to lessen the intake of water. They reported by radio to Honduras (to Dixon's wife, Laura) that their bilge pumps were keeping up with the water and they had "good hopes of making it back." That all changed, when the southerly breeze and seas radically shifted to the north with the arrival of a fast moving frontal system. This is not an uncommon event at that time of year in the Gulf. There is no evidence that the decedents knew of the approaching system when they turned around and headed back northwest, for even the Captain of the SS PONCE (hereinafter PONCE), Joseph Adams, had no indication of any forecast of rough weather.

At 21:05 hours on Thursday, March 13, 1986, the PONCE, a 760–foot drive-on container vessel on its way from Puerto Rico to New Orleans, picked up a MayDay from the JOAN J and proceeded toward the shrimper, which was now bucking heavy seas and had lost one of its bilge pumps. The deck log of the PONCE shows force 8–9 winds (39 to 50 mph) just as the PONCE sighted the JOAN J at 22:05 hours (Plaintiffs' Exhibit 21). At this point the evidence of what actions the master of the PONCE took to effect the rescue is in dispute; however, there are enough consistencies in the evidence for the Court to find that the rescue operation was conducted negligently by agents of the defendant from that point. A force 9 wind is classified on the Beaufort scale (Court's Exhibit 2) as a "strong gale," the effect of which is to create high waves, or as Captain Adams stated in his deposition (he did not testify at trial), 10–12 foot seas, and as the deck log (Plaintiffs' Exhibit 21) described them, "heavy swells, very rough seas". Captain Adams further described this storm as a "very localized disturbance." The JOAN J was at that time still under her own power and did not appear to the crew of the

PONCE to be in any danger of immediate sinking. The Captain, who had earlier ordered pilot ladders (rope ladders with wooden steps) put over the side, was in VHF radio contact with the crew of the JOAN J and advised them to put on life jackets. There is sufficient evidence in the record for the Court to find that both men did so. The Captain then ordered the PONCE to turn to starboard 108–115 degrees (just south of due east), but the JOAN J was unable to come alongside because of the rough seas. According to the Chief Mate, Ernest Trader, at this point it was too rough to expect the JOAN J to be able to get alongside and the men leap onto the pilot ladders. This was especially true because the PONCE, a drive-on container ship, had large metal ventilation flumes that protruded or flared from the side of the ship which would have restricted access to the pilot ladders under such adverse conditions. The crew of the JOAN J was initially willing to stay on board and await the arrival of the Coast Guard helicopter (Plaintiffs' Exhibit 21 at 22:50 hours). The Coast Guard was unable, according to Bruce Campbell, the Coast Guard Search Controller on duty in New Orleans that night, to get a jet with a bilge pump on the scene due to mechanical difficulties, and a helicopter had to return because of thunderstorm activity.

The Captain then ordered a line tied to a drum to try to float it over to the JOAN J (23:10 hours), but the drum and line immediately were swept aft and along side the starboard stern of the PONCE due to the heavy sea, wind, and suction created by the PONCE being underway. At this point, another line was attempted to be passed to the JOAN J by tying it to a ring buoy, but it also was immediately swept to the stern of the ship and did not reach the shrimp boat. Two minutes before the deck log reports the JOAN J was unable to reach the line (22:16 hours), the bell book (Plaintiffs' Exhibit 22) reflects the PONCE's engines were speeded up from slow ahead to half ahead "to maintain course." The Court finds that the PONCE, at this point, was headed in a north-northwesterly di-

rection so that the JOAN J was no longer in her lee.

Daniel Ficca, a wiper from the engine room, had been awakened by the noise of the engines slowing down and went to the area of the rescue, where he observed the PONCE moving into the seas at about five to six knots. Ficca overheard the men on the JOAN J, who were in radio contact with the PONCE, say they had to get off because they were sinking. Ficca then heard the men on the JOAN J ask the Captain "about three times: what are we going to do, Captain?" He then heard the Captain instruct the men to tie onto the single line and jump, which they did. When the men jumped, Ficca knew they were going to be swept under the hull of the PONCE because "in the midship of a ship all the current goes straight underneath the ship and goes straight to the screw." During the course of the rescue, Ficca heard the Captain say he had a schedule to meet.

At 23:30 hours Captain Adams ordered the chief mate to try to give the JOAN J a line by firing the lyle gun (a rocket-powered line-throwing device) with two lines attached so the JOAN J crew could tie onto these lines and be pulled on board the PONCE. This order, under the weather conditions and with the PONCE underway headed into the wind and seas, proved to be fatal. According to Chief Trader's testimony, it "would have been better" for the PONCE to stay along side the JOAN J and wait for the weather to subside when chances for successful rescue would have been better. Given the fact that the drum and a life ring that had been floated out were immediately swept under the ship, it was Chief Trader's opinion that the men aboard the JOAN J would be swept astern also.

Nevertheless, after one unsuccessful firing of the lyle gun, a single heaving line was tied to the lyle messenger line and fired to the JOAN J crew. A small loop had been tied onto the end of the line by the bosun of the PONCE before the line was fired to the fishing vessel. Both men, with life preservers on, tied themselves to the single line, and, the Court finds, given no other choice by the Captain of the PONCE, leaped together into the sea at 00:04 hours. The log entries only minutes earlier (23:50 hours and 00:00 hours) show they did so during a heavy squall, heavy seas, lightning, and a force 10 wind. Such a wind creates very high waves with overhanging crests; the sea takes on a white appearance as foam is blown in very dense streaks (Court Exhibit 2). The JOAN J was not in a lee at that time and, not unexpectedly, Dixon and Jones were immediately swept astern and out of sight. There, Dixon, at least, surely met his death, as he was dragged under the side of the ship while as many as nine crewmen heaved on the line to try to get him aboard. He got hung up under the ship and could only be brought aboard five minutes later by a block and tackle being rigged to hoist him through the open cargo door in the side of the ship from where the rescue operation was being conducted. Denny Jones was nowhere to be seen and had been "swept off the line" (Plaintiffs' Exhibit 21). The bell book shows the PONCE at half ahead at 20:56 hours, slow ahead at 20:57 hours and half ahead at 00:00 hours. The propeller stopped dead at 00:02 hours, but the Court finds that at the time the men jumped, the PONCE was still moving forward sufficiently to create the sweeping action along her sides that contributed to their demise.

Once Dixon was pulled on board, it took several minutes, at best, before CPR was administered to him as none of the CPR equipment had been brought below to the cargo deck where he lay. When the equipment was brought, it was to no avail, and the autopsy reveals that Dixon died from drowning (Plaintiffs' Exhibit 32). Denny Jones was, for all we know, alive and drifting astern in his life vest. But no one will ever know, because at this point, 00:13 hours, the Court finds, the Captain gave the order "full speed" (Plaintiffs' Exhibit 22) and the PONCE proceeded underway to her destination (Deck Log) at 00:15 hours.

A Williamson turn, a maneuver to circle back and search for Jones, should have been conducted, but was not. According to

Chief Trader, "this is an important maneuver" if a man is overboard and would normally be written in the log. There is no such entry. Nor was the course recorder graph from the PONCE, which would have demonstrated if such a maneuver had been conducted, ever produced.[2] All the log reflects is that while the PONCE moved away and the JOAN J drifted astern, "look out constantly playing search light in water. Nothing seen."

Hoyt Dixon was 35 years old at the time of his death and left surviving him a wife and a son, Barron, then age 6. Denny Jones was 33 years old and left his widow and two sons, Denny and Derrey, then ages 10 and 8, and two daughters, Roxanne and Sherannie, then ages 4 and not quite 3. The wives and children, as well as the two men's parents, had depended on the decedents for support. Support for the family was derived primarily from captain's wages paid to the decedents.

Laura Dixon testified that her husband earned captain's wages of between $55,000 and $60,000 annually during 1983, 1984, and 1985.[3] Emma Jones estimated her husband's captain's wages during those years at between $45,000 and $50,000 per year. Deposition testimony of Curby Warren, Hoyt Dixon's partner in the ownership of three boats, and Eldon Hyde, who purchased most of the catch from Denny Jones' boat, provided an estimated annual income for each of the decedents of $30,000 to $40,000 in 1984 and 1985. The Court finds that the testimony of the persons associated with the business of the decedents provides a more reliable estimate of the decedents' income.[4]

Dr. Richard Thompson, plaintiffs' expert economist, testified as to future loss of earnings to decedents' families. Dr. Thompson explained the below-market discount method of determining future loss of income approved by the Former Fifth Circuit in *Culver v. Slater Boat Co.*, 722 F.2d 114, 120 (Former 5th Cir.1983) (en banc). Dr. Thompson was provided with the ages and annual earnings of decedents, and had access to certain basic economic indicators for Honduras. *See, e.g.*, plaintiffs' exhibits 57A (Economic Handbook of the World); 57B (World Development Report); and 57C (tables from the Central Bank of Honduras). He also testified as to economic conditions and the lack of economic data in Honduras, which required him to supplement data obtained from Honduran sources with United States data (for example, work life expectancy).[5] He made his calculations in 1985 American dollars and factored in prejudgment interest. For each decedent, Dr. Thompson testified as to four sets of calculations of lost future income. For two of the calculations, he used the estimates of income provided by the widows; for the remaining two, he used the median of the range of income provided by the decedents' business associates ($35,000). Plaintiffs' exhibits 58D and 59D are based upon United States data and, as the Court concludes below, most accurately project the proper amount of damages to be awarded to plaintiffs.

Mrs. Dixon and Mrs. Jones testified with respect to maintenance and chores their husbands performed around the house and the activities in which the decedents participated with their children. No testimony was given, however, as to the value of these services. Both widows also testified that their husbands had provided support

---

**2.** The Defendant's discovery response to its production amounted to nothing more than an uncompelling, and inferentially damaging, it's "unavailable."

**3.** For clarity and convenience, all monetary figures are given (and were testified to) in American dollars. The Honduran unit of currency is the lempira, the exchange rate for which is approximately 3.5 to 4 lempiras for one U.S. dollar.

**4.** The Court is forced to rely on these estimates as the best evidence of the decedents' income

because unlike the United States, Honduras does not require individuals to file tax returns or other documentation of personal income.

**5.** Defendant objected at trial to the use of United States data. The Court overruled the objection on the proffer by plaintiffs through Dr. Thompson that such data were simply not complied in Honduras and that no reliable source for certain data was available to him except United States data.

for their (the husbands') parents. Mrs. Dixon testified that her husband customarily paid $5,000–7,000 to his father for each of the father's medical treatments in the United States. The last such trip made by Mr. Dixon's father was two years prior to the trial. Before that, he went yearly. No testimony was given as to whether such treatment remains necessary. Mrs. Jones testified that her husband had given his parents $400 per month and provided medical treatment for them. The birth certificates of the decedents' parents were admitted into evidence (Plaintiffs' Exhibits 41, 42, 51, and 52), but no testimony was given as to their life expectancies.

## CONCLUSIONS OF LAW

### A. *The Applicable Law*

There is no question of admiralty jurisdiction, as this case falls under the purview of the Death on the High Seas Act (DOHSA), 46 U.S.C. §§ 761–68. That statute provides a cause of action for "wrongful act, neglect or default occurring on the high seas beyond a marine league from the shore of any state." *Id.* § 761. The proper party to bring suit is the "personal representative of the decedent," who may be, as in this case, the executrix. *See id.;* *Bodden v. American Offshore, Inc.,* 681 F.2d 319 (5th Cir.1982). A cause of action under the DOHSA may be based, as here, on negligence. 46 U.S.C. § 761; *Hartsfield v. Seafarers International Union,* 427 F.Supp. 264 (S.D.Ala.1977).

 To support a cause of action in admiralty based on negligence, the plaintiff must show: 1) a duty owed by the defendant to the plaintiff; 2) a breach of that duty; 3) prejudice or damage sustained by the plaintiff; and 4) a causal connection between the defendant's conduct and plain-

tiff's damage. *See, e.g., Desmond v. Holland America Cruises,* 1981 A.M.C. 211 (S.D.N.Y.1981). Where a maritime rescue is involved, section 2304 of Title 46 of the United States Code imposes a duty to provide assistance at sea:

> A master or individual in charge of a vessel shall render assistance to any individual found at sea in danger of being lost, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or individuals on board.

46 U.S.C.A. § 2304(a) (Supp.1989). It is clear that, based on the facts set forth above, PRMMI owed a duty to the decedents. It is equally clear that, based on the above facts, that PRMMI breached its duty to decedents.[6] That damage was sustained by plaintiffs and their decedents is too obvious for further comment. Finally, as illustrated in the findings of fact, there is no question but that the conduct engaged in by the defendant's agents or employees, i.e., a negligently conducted rescue attempt, resulted in the damage wrought upon plaintiffs and their decedents.

Put another way, liability will be imposed in a maritime rescue situation where "the salvor, through want of due care, has worsened the position of the victim." *Grigsby v. Coastal Marine Service, Inc.,* 412 F.2d 1011, 1021 (5th Cir.1969), *cert. dismissed,* 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970); *Frank v. United States,* 250 F.2d 178 (3d Cir.1957), *cert. denied,* 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069 (1958) (liability imposed if the person to be rescued relies on "some representation about the voluntary service" or if the attempted rescue "is so conducted that it affirmatively injures the one in distress or worsens his position").[7] The conclusion is inescapable

---

6. The facts which the Court concludes constitute breach of defendant's duty to decedents have been set out *supra,* pages 1003 through 1005, and will not be repeated here. Suffice it to say here that there were numerous instances of negligent conduct committed by representatives of defendant during the fatal rescue attempt.

7. *See also* Restatement (Second) of Torts § 323 (1977) ("One who undertakes, gratuitously or

for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.").

that decedents were in danger of being lost at sea, that they were owed a duty of assistance carried out in a reasonable manner by defendant's agents, and that no damage would have resulted to defendant's or decedents' vessel had the PONCE stood by until the storm abated, but that the attempted rescue was carried out in a negligent manner, worsening the positions of Dixon and Jones and resulting in their deaths.

B. *Damages*

 The DOHSA provides for the recovery of pecuniary damages only. 46 U.S.C. § 762. Such damages include the following: loss of support; loss of services; loss of nurture, guidance, care, and instruction; loss of inheritance; and funeral expenses (if paid by the dependents). Recovery is distributed among the following classes of beneficiaries in proportion to the loss found to have been suffered: the decedent's spouse, parent, child, and dependent relative. *Id.* §§ 761, 762.

As noted by the Former Fifth Circuit, "[t]he paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned." *Culver v. Slater Boat Co.*, 722 F.2d 114, 120 (Former 5th Cir.1983) (en banc). In the Eleventh Circuit, the sole approved method for determining loss-of-future-earnings awards is the below-market-discount method. *Id.* at 122.[8] This calculation is made by first estimating the decedent's gross lost income, then deducting expenses and taxes he would have paid. According to *Culver*, an estimate of the lost stream of income is made by calculating "a series of after tax

payments, one in each year of the worker's expected remaining career." *Id.*[9] Each annual figure is then discounted by the below-market discount rate (also referred to as the real interest rate), which is determined by subtracting the estimated future inflation rate from the market interest rate.[10] This calculation determines the present value of lost future earnings for each year. Adding these yearly present value figures yields the total amount of future earning loss. The amount the decedent would have consumed must then be subtracted to determine the proper amount of damages.

As noted, Dr. Richard Thompson, plaintiffs' economic expert, testified as to four sets of calculations for lost future income for each decedent. Two of these figures were based on the widows' estimates of their husbands' incomes, which the Court rejected as being less reliable than the businessmen's figures. The Court consequently rejects the calculations of lost future income based on the widows' income estimates.[11] The lost future earnings figures in plaintiffs' exhibits 58C and 59C are based upon the approved annual income figure of $35,000, but are derived using an "inflation-included" method not approved in *Culver*. The Court therefore rejects these figures as well. Based upon Dr. Thompson's uncontradicted testimony, the exhibits utilized by him in arriving at a figure for damages, and his calculation of a below-market interest rate of 0.812%, the Court concludes that the proper calculation of damages is contained in plaintiffs' exhibits 58D and 59D, which are adopted by this Court as its calculations and appended to these findings and conclusions as Appendices A and B.[12]

---

**8.** The Eleventh Circuit has adopted as binding precedent all en banc decisions of the former Fifth Circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982).

**9.** As noted above in the findings of fact, this approach was utilized by Dr. Thompson.

**10.** The *Culver* court approves a below-market discount rate within the range of –1.5% to 3% if the figure used by the court is supported by sound reason and/or expert opinion. 722 F.2d at 122.

**11.** The calculations rejected by the Court which were based on the widows' estimates of income are reflected in plaintiffs' exhibits 58A and 58B (for Dixon) and 59A and 59B (for Jones).

**12.** Each of these exhibits lists the factors necessary for the *Culver* calculation and their values, and features a table showing the expected future income, after-tax earnings, the present value of the after-tax earnings, and the resulting figure for economic loss after personal consumption is subtracted.

The Court accordingly concludes that the present value of Hoyt Dixon's family's loss of support and inheritance is $631,701.00 and of Denny Jones' is $690,399.81. Although the widows testified as to services, nurture, guidance, and instruction provided by decedents, no testimony was given as to the monetary value of such services, nurture, guidance, and instruction. Therefore the Court has no means by which to calculate such value and accordingly declines to award damages for these items.

Similarly, although both Mrs. Dixon and Mrs. Jones testified as to financial support provided by the decedents to their parents, the parents' life expectancies were not furnished to the Court, with the result that the Court is unable to determine, and so declines to award, damages for these items.

### C. *Comparative Negligence*

■ The law of comparative negligence applies in DOHSA actions. 46 U.S.C. § 766. The Court first addresses decedents' alleged pre-rescue negligence, then turns to acts committed by the decedents during the rescue attempt. The Court concludes that any negligence committed by the decedents prior to the rescue is not relevant to the issues at bar because such pre-rescue negligence (if any) was not the proximate cause of the deaths of Dixon and Jones. *See, e.g., United States v. DeVane,* 306 F.2d 182 (5th Cir.1962) (negligence of captain of vessel in distress in failing to properly equip vessel, to heed weather warnings, and to lash supplies and flares to life raft prior to negligence of Coast Guard and therefore not proximate cause of injury). As noted above, no harm would have come to Dixon and Jones had they and the PONCE waited out the storm before attempting the rescue. The harm that befell the decedents occurred only during the attempted rescue, and not as a proximate result of any acts committed by the decedents prior to the time of the attempted rescue. The Court therefore need not further address the issue of pre-rescue negligence as set forth in defendant's brief.

The defendant takes the position that the fault of the fatal rescue attempt fell on the decision of the crew of the JOAN J to jump when they did. The Court rejects this contention based on the overwhelming weight of the evidence, and concludes that Captain Adams made that decision for them when he continued the rescue efforts under such dangerous conditions. Since the JOAN J was still afloat, under its own power, and did not appear to be in any immediate danger of sinking, the PONCE could have come at least partially to starboard, created somewhat of a lee, and let the JOAN J ride the storm out and then attempt a rescue.

The Court further finds that the men aboard the JOAN J did not choose to abandon the JOAN J at the height of the storm, but were given no other choice by the actions of the Captain of the PONCE. Theirs' was a Hobson's choice: Come with us now or be left to fend for yourselves. That they chose to abandon ship when they did was understandable under the circumstances that were presented them. It was a wrong decision, but not because of any negligence on their part. Because the Court finds no comparative negligence on the part of the decedents, the damages awarded to plaintiffs are not reduced.

### CONCLUSION

For the foregoing reasons, the Court finds that judgment is due to be entered in favor of plaintiffs and against defendant Puerto Rico Marine Management Inc., to be distributed to the beneficiaries as follows: $631,701.00 to Laura Dixon and her son, Barron Dixon, and $690,399.81 to Emma Jones and her children, Denny, Derrey, Roxanne, and Sherannie. Plaintiffs may recover of defendant their taxable costs. Judgment will be entered by separate order.

It is so ORDERED.

### APPENDIX A
*Mr. Hoyt Dixon*

Life Expectancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39.54 years
Work-life Expectancy . . . . . . . . . . . . . . . . . . . . . . . 25.7 years

Earning Capacity............................$35,000.00
Growth in Earnings .........................1.77%
Real Lifetime Earnings.....................$1,125,556
Effective Tax Rate.........................17.7%
After–Tax Lifetime Earnings ...............$926,333
Discount Rate..............................0.812%
Present Value of Lifetime Earnings.........$854,063
Personal Consumption Expenditures .........20.75%–
 30.61%
Present Value Less Per. Con. Expend. .......$631,701

*Hoyt Dixon 11–28–1989*

| Year | Expected Earnings | After–Tax Earnings | Present Value | Economic Loss |
|---|---|---|---|---|
| 1986 | $28,597.99 | $23,536.15 | $24,114.38 | $19,108.23 |
| 1987 | 36,249.96 | 29,833.72 | 30,320.37 | 24,025.86 |
| 1988 | 36,891.58 | 30,361.77 | 30,608.40 | 24,254.10 |
| 1989 | 37,544.56 | 30,899.18 | 30,899.18 | 24,484.51 |
| 1990 | 38,209.10 | 31,446.09 | 31,192.71 | 24,717.11 |
| 1991 | 38,885.40 | 32,002.68 | 31,489.03 | 24,951.91 |
| 1992 | 39,573.67 | 32,569.13 | 31,788.17 | 25,188.95 |
| 1993 | 40,274.12 | 33,145.60 | 32,090.15 | 25,428.23 |
| 1994 | 40,986.97 | 33,732.28 | 32,394.99 | 25,669.79 |
| 1995 | 41,712.44 | 34,329.34 | 32,702.73 | 25,913.65 |
| 1996 | 42,450.75 | 34,936.97 | 33,013.41 | 26,159.82 |
| 1997 | 43,202.12 | 35,555.35 | 33,327.02 | 26,408.33 |
| 1998 | 43,966.80 | 36,184.68 | 33,643.62 | 25,578.79 |
| 1999 | 44,745.00 | 36,825.14 | 33,963.22 | 23,567.08 |
| 2000 | 45,536.99 | 37,476.95 | 34,285.86 | 23,790.96 |
| 2001 | 46,342.99 | 38,140.29 | 34,611.57 | 24,016.97 |
| 2002 | 47,163.26 | 38,815.36 | 34,940.37 | 24,245.12 |
| 2003 | 47,998.05 | 39,502.40 | 35,272.29 | 24,475.44 |
| 2004 | 48,847.61 | 40,201.58 | 35,607.37 | 24,707.95 |
| 2005 | 49,712.21 | 40,913.15 | 35,945.63 | 24,942.67 |
| 2006 | 50,592.12 | 41,637.31 | 36,287.10 | 25,179.62 |
| 2007 | 51,487.59 | 42,374.29 | 36,631.82 | 25,418.82 |
| 2008 | 52,398.92 | 43,124.31 | 36,979.81 | 25,660.29 |
| 2009 | 53,326.38 | 43,887.61 | 37,331.11 | 25,904.05 |
| 2010 | 54,270.25 | 44,664.42 | 37,685.74 | 26,150.14 |
| 2011 | 24,589.11 | 20,236.83 | 16,937.31 | 11,752.80 |
| | $1,125,556.00 | $926,332.62 | $854,063.38 | $631,701.19 |

RE: Hoyt Dixon
Date of Accident: 3/14/86
Date of Birth: 9/30/51
Age: 34 Sex: Male
Life Expectancy 39.54
Work–Life Expectancy 25.7
Personal Con. Exp: 20.75% to 30.61%
Dependents:
 Spouse: Age 30
 Child: Age 6

Calculated on: 11–28–1989
Marital Status: Married
Disability: N/A
Base Earnings in 1985
 dollars: $35,000.00
Growth Rate: 1.77%
Discount Rate: 0.812%
Tax Rate: 17.70%

### APPENDIX B
*Denny Jones 11–28–1989*

| Year | Expected Earnings | After–Tax Earnings | Present Value | Economic Loss |
|---|---|---|---|---|
| 1986 | $28,597.99 | $23,536.15 | $24,114.38 | $20,731.13 |
| 1987 | 36,249.96 | 29,833.72 | 30,320.37 | 26,066.42 |
| 1988 | 36,891.58 | 30,361.77 | 30,608.40 | 26,314.05 |
| 1989 | 37,544.56 | 30,899.18 | 30,899.18 | 26,564.02 |
| 1990 | 38,209.10 | 31,446.09 | 31,192.71 | 26,816.38 |
| 1991 | 38,885.40 | 32,002.68 | 31,489.03 | 27,071.12 |
| 1992 | 39,573.67 | 32,569.13 | 31,788.17 | 27,328.29 |
| 1993 | 40,274.12 | 33,145.60 | 32,090.15 | 27,587.90 |
| 1994 | 40,986.97 | 33,732.28 | 32,394.99 | 27,849.98 |
| 1995 | 41,712.44 | 34,329.34 | 32,702.73 | 27,987.91 |
| 1996 | 42,450.75 | 34,936.97 | 33,013.41 | 26,159.82 |
| 1997 | 43,202.12 | 35,555.35 | 33,327.02 | 26,408.33 |
| 1998 | 43,966.80 | 36,184.68 | 33,643.62 | 26,659.21 |
| 1999 | 44,745.00 | 36,825.14 | 33,963.22 | 25,485.63 |
| 2000 | 45,536.99 | 37,476.95 | 34,285.86 | 23,962.39 |
| 2001 | 46,342.99 | 38,140.29 | 34,611.57 | 24,190.03 |
| 2002 | 47,163.26 | 38,815.36 | 34,940.37 | 24,419.82 |
| 2003 | 47,998.05 | 39,502.40 | 35,272.29 | 24,651.80 |
| 2004 | 48,847.61 | 40,201.58 | 35,607.37 | 24,885.99 |
| 2005 | 49,712.21 | 40,913.15 | 35,945.63 | 25,122.40 |
| 2006 | 50,592.12 | 41,637.31 | 36,287.10 | 25,361.05 |
| 2007 | 51,487.59 | 42,374.29 | 36,631.82 | 25,601.98 |
| 2008 | 52,398.92 | 43,124.31 | 36,979.81 | 25,845.19 |
| 2009 | 53,326.38 | 43,887.61 | 37,331.11 | 26,090.71 |
| 2010 | 54,270.25 | 44,664.42 | 37,685.74 | 26,338.56 |
| 2011 | 55,230.83 | 45,454.97 | 38,043.74 | 26,588.77 |
| 2012 | 38,344.94 | 31,557.89 | 26,199.69 | 18,310.96 |
| | $1,194,542.62 | $983,108.56 | $901,369.50 | $690,399.81 |

RE: Denny Jones
Date of Accident: 3/14/86
Date of Birth: 1/31/53
Age: 33 Sex: Male
Life Expectancy 40.46
Work–Life Expectancy 26.6
Personal Con. Exp.: 14.03% to 30.61%
Dependents:
 Spouse: Age 32
 Children: Ages 8 & 4

Calculated on: 11–28–1989
Marital Status: Married
Disability: N/A
Base Earnings in 1985
 dollars: $35,000.00
Growth Rate: 1.77%
Discount Rate: 0.812%
Tax Rate: 17.70%