In the Matter of the **ADVENTURE BOUND SPORTS, INC., and Andre Smith d/b/a Adventure Bound Sports for Exoneration from or Limitation of Liability.**

**No. CV 489–274.**

United States District Court,
S.D. Georgia,
Savannah Division.

June 29, 1994.

Barnard Portman, Savannah, GA, Matthew W. Monroe, Boca Raton, FL, for petitioner.

Edwin D. Robb, Jr., Savannah, GA, for claimant Laufman.

Jeffrey W. Laskey, Savannah, GA, for claimant Wentzel.

Robert S. Glenn, Jr., Savannah, GA, Frank R. Seigel, Atlanta, GA, for claimant Mac-Lean.

Lawrence B. Lee, Asst. U.S. Atty., Savannah, GA, for movant.

### *ORDER AND MEMORANDUM*

NANGLE, District Judge.

This case arose from a deep sea scuba diving accident that occurred on June 4, 1989, in which Paul Wentzel and Warren Seeds were killed.[1] The owners of the vessel involved in the accident filed a petition for exoneration from and/or limitation of liability, and the decedents' personal representatives filed claims for recovery pursuant to the Death on the High Seas Act, 46 U.S.C.App. §§ 761–768 (1975) ("DOHSA"). The Court bifurcated this case on the issues of liability and damages and, after a bench trial on the liability question, denied the owners' petition for exoneration from and/or limitation of liability. *In re Adventure Bound Sports, Inc.,* 837 F.Supp. 1244 (S.D.Ga.1993). Currently before the Court is the issue of the amount of damages sufficient to compensate the claimants under DOHSA. After hearing the evidence, examining the exhibits, pleadings, stipulations, and proposed findings of fact and conclusions of law of the parties, this Court makes its Findings of Fact and Conclusions of Law as to the amount of damages appropriate to compensate the claimants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW [2]

■ DOHSA permits a decedent's spouse, parent, child, or dependent relative to recover for pecuniary losses sustained on account of the death. 46 U.S.C. §§ 761–762. "The measure of recovery under ... DOHSA is the actual pecuniary benefits that the decedent's beneficiaries could reasonably have expected to receive from the continued life of the decedent." *Solomon v. Warren,* 540 F.2d 777, 786 (5th Cir.1976), *cert. dismissed sub nom. Warren v. Serody,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). Pecuniary losses include loss of support, loss of services, funeral expenses, and loss of nurture and guidance to the decedent's children. *Mas-*

---

1. For a detailed description of the facts giving rise to this action, see *In re Adventure Bound Sports, Inc.,* 837 F.Supp. 1244 (S.D.Ga.1993).

2. Because many of the Court's determinations involve mixed questions of fact and law, the Court will consolidate its findings of fact and conclusions of law into a single discussion.

*cuilli v. United States,* 343 F.Supp. 439, 441–42 (E.D.Pa.1972), *rev'd on other grounds,* 483 F.2d 81 (3d Cir.1973). The Court need not establish the value of a claimant's pecuniary losses with mathematical precision. *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 207 (2d Cir.1984); *Whitaker v. Blidberg Rothchild Co.,* 296 F.2d 554, 555 (4th Cir. 1961); *In re Risdal & Anderson, Inc.,* 291 F.Supp. 353, 357 (D.Mass.1968). Nevertheless, "the amount awarded must bear some relation to the evidence and cannot be based on speculation." *Dugas v. National Aircraft Corp.,* 438 F.2d 1386, 1393 n. 18 (3d Cir. 1971). In the instant case, therefore, claimants may recover damages for the loss of reasonably expected benefits to which a pecuniary value can be assigned.

## I. Wentzel Claimants

Paul Wentzel's wife, Patricia, and his sons, Matthew and Justin, seek compensation for the pecuniary losses they have experienced due to Paul's death. Paul Wentzel was the sole provider for his family during his life. At the time of the accident, Paul and Patricia had been married for three years and had a strong marriage. Matthew Wentzel was two years old and Justin Wentzel six weeks old at the time of their father's death.

Paul Wentzel was born on March 21, 1960, and died on June 4, 1989. He was an enlisted man who had served eleven years in the United States Army, and at the time of his death he was an E–6 Sergeant First Class. Patricia Wentzel testified at trial and the Court finds that Paul would have remained in military service until 1998, when he would have become eligible for military retirement. He then would have sought civilian employment. Based on expert testimony adduced at trial, the Court finds that Paul would have retired from the civilian workforce in 2020, at the age of sixty. The parties have stipulated that Paul Wentzel would have lived until 2034.

**A. Loss of Support.** Paul Wentzel's family, Patricia Wentzel, Justin Wentzel, and Matthew Wentzel, may recover for the loss of Paul's support occasioned by his death. *Sea–Land Servs., Inc. v. Gaudet,* 414 U.S.

573, 584, 94 S.Ct. 806, 814, 39 L.Ed.2d 9 (1974). This loss of support takes several forms. The Wentzel claimants had a reasonable expectation of receiving benefits from Paul's military wages; Paul's military allowances, including allowances for quarters (BAQPD), separate rations, leave rations, and variable housing (VHA); Paul's military retirement income; and Paul's civilian income.

■ 1. *Military Wages and Allowances.* The parties have stipulated that Paul Wentzel, an E–6 Sergeant First Class, received $16,714.80 per year in basic pay at the time of his death, and his family had a reasonable expectation of continuing to benefit from Paul's basic pay. The family also argues that Paul regularly received military allowances supplementing his basic pay: BAQPD (allowances for quarters), separate rations, leave rations, and VHA (variable housing). At trial, United States Army Major Andrew Milani testified that all married servicemen received BAQPD. Further, the Wentzel claimants have offered evidence indicating that Paul received separate rations, leave rations, and VHA consistently from the time of his marriage until his death. When Paul Wentzel died, he was receiving $7,822.44 per year in allowances, as follows: $4,654.80 per year in BAQPD; $2,052.00 per year in separate rations; $342.00 per year in leave rations; and $773.64 per year in VHA. The Court finds that the Wentzel claimants had a reasonable expectation of receiving these military allowances, making them a pecuniary loss under DOHSA. The Court thus will award the Wentzel claimants a total of $24,-537.24 per year in military wages for the years Paul Wentzel would have continued military service, reduced to present value.[3]

■ 2. *Military Entitlements.* The Wentzel claimants also seek compensation for several military entitlements, or fringe benefits, including medical care under the CHAMPUS program, social security coverage, a federal tax exemption, paid leave and holidays, education programs, morale, welfare, and recreation activities, counseling and assistance programs, and space available

---

**3.** The Court discusses the present value calculation below.

travel. A court may include lost fringe benefits in a lost support award, although courts often exclude these amounts for the sake of simplicity. *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 534, 103 S.Ct. 2541, 2549, 76 L.Ed.2d 768 (1983). Because the Court finds that the Wentzel claimants did not prove sufficiently their pecuniary loss concerning these benefits, the Court will not award damages on this ground.

The Court finds that claimants did not experience a pecuniary loss as to their medical benefits under CHAMPUS, since they continue to receive CHAMPUS coverage despite Paul Wentzel's death. The Wentzel claimants' contention that their coverage is now qualitatively different, and that this difference is a pecuniary loss, asks the Court to speculate upon both the nature and pecuniary value of this difference. The Court refuses to engage in such speculation, and finds that, as the Wentzel family still receives CHAMPUS medical benefits, they have not experienced a pecuniary loss in this area.

Similarly, the Court finds that claimants did not experience a pecuniary loss as to their social security benefits. The Wentzel claimants argue that they had a reasonable expectation to receive social security coverage that they lost upon Paul Wentzel's death. Patricia Wentzel testified, however, that her family currently receives social security benefits as a result of Paul's death. Because the Wentzel claimants are currently receiving social security benefits, the Court finds that they did not experience a pecuniary loss as to social security coverage.

The Wentzel claimants have not successfully demonstrated that they had a reasonable expectation of receiving additional fringe benefits while Paul Wentzel was alive. Claimants' expert witness, Dr. Costen, briefly mentioned these benefits in a list of military entitlements that he culled from a compensation breakdown provided by the military. The parties agreed to an equally vague stipulation that Paul Wentzel "would have received fringe benefits while employed by the military." (Joint Stip. No. 36.) No further reference to these benefits exists in the record; the nature of these benefits and their continuing availability to claimants is not addressed. The Court therefore finds that the claimants have not provided sufficient evidence to show that they experienced a pecuniary loss as to these fringe benefits.

■ 3. *Military Retirement.* The Wentzel family seeks compensation for the military retirement income Paul Wentzel would have received but for his death. The Court finds that Paul intended to complete twenty years of service in the military, retiring in 1998. This tenure would have entitled Paul to a retirement income from which the Wentzel claimants had a reasonable expectation of receiving a pecuniary benefit. The Court further finds the value of this annual retirement income to be fifty percent of Paul Wentzel's base pay at the time of his retirement.[4] At the time of his death, Paul Wentzel earned $16,714.00 in basic pay. Applying a six percent growth rate to this figure,[5] the Court estimates that, upon his 1998 retirement, Paul Wentzel would have earned $28,239.31 in basic pay. Paul Wentzel's annual retirement income, from 1999 until his death, would have been $14,119.66, and the Court will award this to his family, reduced to present value.

■ 4. *Private Sector Wages and Fringes.* Patricia Wentzel testified at trial that her husband, Paul Wentzel, planned to obtain civilian employment after retiring from the military. The Court finds, therefore, that the Wentzel claimants experienced the pecuniary loss of the support Paul Wentzel would have provided them from his private sector earnings. At trial, both sides presented expert economic testimony estimating the starting salary that Paul would have received in private sector employment.

---

**4.** The Court bases this finding upon Dr. Costen's testimony as to his "understanding" of military retirement income calculations. Standing alone, Dr. Costen's testimony is not the best kind of evidence on this point. However, petitioners seem to concede this formula for calculating retirement income. *See* [cite]

**5.** As discussed below, the Court has chosen to apply a six percent growth rate in its calculations.

Claimants' expert, Dr. Costen, assumed that Paul would have moved laterally into the private sector, attaining employment at a salary commensurate to his military salary at the time of his retirement. Petitioners' expert, Dr. Bart, relied on national studies setting out the average starting salary a person of similar educational level, experience, age and gender could attain. The Court agrees with and adopts Dr. Bart's estimate, finding that Paul Wentzel would have begun working in the private sector for an annual salary of $26,790.00. The Court therefore awards claimants $26,790.00 per year for the years in which Paul Wentzel would have worked in the private sector, reduced to present value.

■ The Wentzel family also seeks compensation for the loss of fringe benefits that Paul Wentzel would have received while working in the private sector, including social security, pension, and life insurance benefits. As discussed above, the Court holds that the Wentzel family did not incur a pecuniary loss of social security benefits since they actually received these benefits upon Paul Wentzel's death; the Court therefore will not compensate them for the loss of social security benefits that they would have accrued through Paul Wentzel's private sector employment. The Wentzel claimants attempted to demonstrate the loss of pension and life insurance benefits through the testimony of their expert economist, Dr. Costen. At trial, Dr. Costen valued several vaguely-defined lost fringe benefits at fifteen percent of Paul Wentzel's estimated civilian income. In post-trial submissions, however, claimants valued lost pension and life insurance benefits at 3.68 percent of civilian income. The Court agrees with Dr. Costen's concession that the calculation of loss from fringe benefits is "nebulous," (Tr. at 71); it finds from the evidence presented that the value of any lost fringe benefits is too speculative to be included in the Court's calculation of lost income. *Cf. Treadaway v. Societe Anonyme Louis–Dreyfus,* 894 F.2d 161, 169 (5th Cir.1990) (finding expert economic testimony on employer's specific contributions to union pension and welfare fund, as opposed to bare benefit statement, sufficient to show value of fringes).

■ 5. *Deduction for Paul Wentzel's Personal Consumption.* Courts must reduce lost support awards by the amount of money that the decedent would have consumed personally. *United States v. English,* 521 F.2d 63, 71–72 (9th Cir.1975). Expert testimony concerning the amount of a decedent's personal consumption may take the specific form of an analysis of the decedent's spending or the more general form of statistically relevant studies on the subject. *See Burlington N., Inc. v. Boxberger,* 529 F.2d 284, 287 (9th Cir.1975) (finding no error in admitting expert testimony based upon charts rather than analysis of particular family).

■ At trial, claimants and petitioners presented conflicting expert testimony concerning the percentage of Paul Wentzel's earnings that he would have consumed personally. Claimants' expert, Dr. Costen, testified that Paul Wentzel would have personally consumed 22 percent of his earnings, based on tables published by the Bureau of Labor Statistics estimating the personal consumption of the head of a four-person household. Dr. Costen stated that these tables took into account the decrease in the number of household members over time, an important concern since, as Paul Wentzel's sons reached majority, they likely would have left the household. Petitioners' expert, Dr. Bart, testified that Paul Wentzel's personal consumption would have risen over time, and suggested several percentages drawn from studies to represent increasing personal consumption as the number of household members decreased. Viewing the personal consumption figure to represent Paul Wentzel's spending on things solely benefitting himself, the Court agrees with claimants' method of estimating personal consumption, and therefore will reduce the amount of lost income to the Wentzel claimants by 22 percent.

■ **B. Loss of College Education.** The Wentzel claimants contend that they had a reasonable expectation that Paul Wentzel would have paid for a college education for his sons, Matthew and Justin. They therefore argue for compensation for the loss of this pecuniary benefit. Damages for loss of

a college education are proper under DOHSA. *See Solomon,* 540 F.2d at 793–94. The Court finds in this instance, however, that the Wentzel claimants have not sustained a pecuniary loss. The Wentzel family is being compensated for the loss of all of Paul Wentzel's lifetime earnings that he would not otherwise have consumed personally. No evidence at trial suggested that Paul would have used funds other than those he had earned over the course of his life to pay for his sons' educations. Because the Wentzel claimants are already being compensated for the loss of Paul's earnings, they experience no pecuniary loss as to Matthew and Justin's college educations.

■ **C. Loss of Services.** Loss of household services performed by the decedent, such as lawn and maintenance work, constitute a pecuniary loss. *Gaudet,* 414 U.S. at 585, 94 S.Ct. at 814–15. To recover for this pecuniary loss, a claimant must present testimony assigning a value to the services performed by the decedent. *Ivy v. Security Barge Lines,* 585 F.2d 732, 740 (5th Cir.1978), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815 (1980); *Martinez v. Puerto Rico Marine Management,* 755 F.Supp. 1001, 1008 (S.D.Ala.1990).

■ Patricia Wentzel testified at trial that Paul Wentzel spent approximately ten hours a week performing household chores such as washing dishes, doing laundry, caring for the children, and maintaining the home, yard, and family car. She stated that, since Paul Wentzel's death, she has had to pay a third person for home and car maintenance and repair that Paul would have performed. The Wentzel claimants suggest that the Court value these services at $6 per hour. The Court agrees, and will award the Wentzel family $60 per week to compensate their loss of Paul Wentzel's household services, reduced to present value.

■ **D. Loss of Nurture and Guidance.** The Wentzel claimants seek compensation for the nurture and guidance that Paul Wentzel would have provided his sons, Matthew and Justin, had he lived. "[T]he loss to children of the nurture, instruction, and physical, intellectual, and moral training that

they would have received from their parents, but for the parent's [sic] wrongful death, may constitute a pecuniary loss … recoverable … under DOHSA." *Solomon,* 540 F.2d at 788. To recover for this loss, the Wentzel claimants must show that Paul Wentzel was fit to nurture and guide his sons and that he had actually provided such nurture and guidance to them in his lifetime. *Id.* They also must present evidence as to the monetary value of these services, *see Martinez,* 755 F.Supp. at 1008 (refusing to compensate plaintiff for lost nurture and guidance since no testimony provided as to value), although this value "cannot be computed with any degree of mathematical certainty." *Solomon,* 540 F.2d at 788.

■ The evidence adduced at trial depicts Paul Wentzel as a conscientious, hardworking man with high aspirations for himself and his family. Paul clearly was fit to provide nurture and guidance to his sons. The evidence further shows that Paul rendered such nurture and guidance to his sons during his life. Although his sons were very young at the time of Paul's death—Matthew was two years old and Justin was six weeks old—the evidence of Paul's devotion and commitment to the boys convinces the Court that Paul would have continued to provide nurture and guidance throughout the boys' minority. *See Boykin v. Bergesen D.Y. A/S,* 835 F.Supp. 274, 286 n. 16 (E.D.Va.1993) ("The requirement that such services have been actually rendered does not prevent an award for children who are too young to have had the opportunity to actually receive training and guidance.") Matthew and Justin Wentzel thus are entitled to recover for the loss of their father's nurture and guidance.

To demonstrate the value of this loss, the Wentzel claimants presented evidence concerning the starting salaries of teachers, guidance counselors, and psychologists, professions that they analogize to the roles Paul would have filled in raising his sons. Having considered this evidence, and acknowledging the difficulty of reducing to an economic figure what is to these children an invaluable loss, the Court will award Matthew and Jus-

tin each $10,000 per year through their eighteenth birthdays,[6] reduced to present value.

■■■ **E. Funeral Expenses.** The United States Supreme Court has recognized funeral expenses as a pecuniary loss if paid by the decedent's dependents. *Gaudet,* 414 U.S. at 591, 94 S.Ct. at 818; *see also Martinez,* 755 F.Supp. at 1007 (finding funeral expenses a pecuniary loss under DOHSA); *Moore v. The O/S Fram,* 226 F.Supp. 816, 818 (S.D.Tex.1963) (same), *aff'd sub nom. Wilhelm Seafoods, Inc. v. Moore,* 328 F.2d 868 (5th Cir.1964); *cf. Barbe v. Drummond,* 507 F.2d 794 (1st Cir.1974) (finding funeral expenses *not* a pecuniary loss under DOHSA if paid by decedent's estate rather than by decedent's dependents). The Wentzel family claims this loss, presenting as evidence funeral bills totalling $6,557.00, which represent their payment for Paul Wentzel's funeral service, funeral plot, and burial. Patricia Wentzel testified at trial that the military reimbursed her $3,000.00 for these expenses. The Court therefore finds that the Wentzel claimants incurred a pecuniary loss of $3,557.00 in funeral expenses.

## II. Claimant Jason Seeds

Through John MacLean, administrator of Warren Seeds' estate, Warren's son Jason Seeds seeks compensation for pecuniary losses suffered on account of his father's death.[7] Warren was divorced from Jason's mother, Sandra Seeds Foster, in 1985. Jason lived with his mother in Atlanta, Georgia, approximately 250 miles from Warren. Warren paid Jason monthly child support and had visitation rights with Jason. Warren Seeds died shortly before Jason's ninth birthday.

Warren Seeds was born on September 28, 1954, and died on June 4, 1989. At the time of his death, Warren Seeds was a Chief Warrant Officer with the United States Army; he had served in the Army for eleven years. The Court finds that Warren would have continued to serve in the Army until he was eligible for retirement, in 1998, and then would have sought civilian employment. Based on expert testimony adduced at trial, the Court finds that Warren Seeds would have retired from civilian employment in 2014, at the age of sixty. The parties have stipulated that Warren Seeds would have lived until 2028.

■■■ **A. Loss of Support.** Claimant Jason Seeds seeks compensation for the loss of his father Warren Seeds' military wages, retirement income, and certain military benefits such as BAQPD, BAS, VHA, and flight pay. The Court finds that Jason Seeds had no reasonable expectation to receive these benefits from his father, and thus may not recover for their loss. Jason's parents were divorced, and Jason lived with his mother, Sandra Seeds Foster. While Jason contends that his parents were in the midst of reconciling, and that Sandra was planning to resume living with Warren, the Court feels that the evidence pointing to a reconciliation is inconclusive and that the likelihood of such a reconciliation thus is too speculative to serve as a basis for damages. The Court therefore will evaluate Jason's reasonable expectations of support as Warren Seeds' noncustodial child.

■■■ Warren Seeds provided Jason with a monthly child support payment of $430.80. In addition, Warren spent approximately $500 per year on additional gifts for Jason.

---

**6.** The Wentzel claimants, along with claimant Seeds, seek awards for nurture and guidance until age twenty-one, although they reach the age of majority at eighteen. While the Eleventh Circuit has not ruled out the possibility that the facts and circumstances of a case might warrant an award for the nurture and guidance of an adult child, it has stressed that " 'those who have reached their majority must be very specific to show that their parents' guidance had a pecuniary value beyond the irreplaceable values of companionship and affection.' " *Solomon,* 540 F.2d at 789 (quoting *First Nat'l Bank in Greenwich v. National Airlines,* 171 F.Supp. 528, 539

(S.D.N.Y.1958), *aff'd,* 288 F.2d 621 (2d Cir.), *cert. denied sub nom. Kessler v. National Airlines,* 368 U.S. 859, 82 S.Ct. 102, 7 L.Ed.2d 57 (1961)). None of the claimants have made a sufficient showing to the Court to warrant compensation for nurture and guidance into majority.

**7.** John MacLean, administrator of Warren Seeds' estate, is Seeds' personal representative and the actual claimant on the behalf of Jason Seeds, Warren's minor son. For the sake of simplicity, however, the Court will refer to Jason Seeds, the beneficiary, as the claimant.

This was the extent of Jason's reasonable expectation of support from Warren; Jason did not benefit from Warren's military salary or entitlements, since Jason did not live in Warren's home. Similarly, Jason had no reasonable expectation of benefitting from Warren's retirement income beyond the amounts provided Jason in child support and miscellaneous gifts. The Court therefore will award Jason $430.80 per month plus $500 per year in loss of support, reduced to present value.

**■ B. Loss of College Education.** Claimant Jason Seeds contends that, had his father Warren Seeds lived, Warren would have provided Jason with a college education on top of his child support obligation. Jason therefore seeks compensation for this additional pecuniary loss.[8] The parties' joint stipulations and the evidence at trial depict Warren Seeds as an achievement-oriented, responsible man and a committed father. Additionally, Warren appeared to value education; at the time of his death, he was pursuing a degree in aeronautical science through an off-campus education program. Based on this evidence concerning Warren Seeds' character, the Court finds that Jason had a reasonable expectation that his father would have provided him with a college education. The Court further agrees with the $30,000 value assigned to this loss by claimants' economic expert, Dr. Costen, along with Dr. Costen's reasoning that this amount should not be reduced to present value since any interest earned on this amount will be offset by tuition increases from now until Jason's college matriculation. The Court thus will award Jason $30,000 for lost college education.

**■ C. Loss of Inheritance.** Jason Seeds seeks compensation for the assets that he would have inherited from his father,

Warren Seeds, had Warren not died prematurely. Children have a reasonable expectation of benefitting from any prospective accumulation of their parent's estate, making lost inheritance a legitimate pecuniary loss in a DOHSA action. *Solomon,* 540 F.2d at 790 (5th Cir.1976); *see also National Airlines v. Stiles,* 268 F.2d 400, 403–04 (5th Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959); *Martin v. Atlantic Coast Line R.R. Co.,* 268 F.2d 397, 398 (5th Cir.1959). To recover for this loss, Jason must present evidence showing that, if his father had lived, he would have accumulated property that would have passed to Jason through intestate succession. *See Solomon,* 540 F.2d at 790–91.[9]

**■** Jason Seeds argues that, had Warren lived, he would have accumulated savings representing the value of his military and civilian income and fringe benefits, less the amount that Warren consumed personally or spent on his children. "Future lost earnings and wages are a loss provable for the determination of lost inheritance." *In re Korean Air Lines Disaster,* 807 F.Supp. 1073, 1089 (S.D.N.Y.1992). Through his expert economist, claimant Seeds presented evidence of the present-day value of Warren Seeds' income and of the percentage of this income that Warren, living in a one-person household, would have consumed personally. Based on this evidence, the Court finds that Warren would have accumulated savings that would have passed to Jason through intestate succession.[10] The Court calculates this amount as follows.

1. *Overall Property Accrued.* The Court finds that Warren Seeds would have accumulated property from the following sources: basic military wages; flight pay; military

---

8. Because Jason Seeds' anticipated support was limited to monthly child support payments, his father would have used additional funds to finance Jason's college education, making this a separate pecuniary loss to Jason. The Wentzel claimants, in contrast, had a reasonable expectation of receiving as loss of support the funds that Paul Wentzel would use to finance their college educations, and thus did not experience an additional pecuniary loss.

9. *Solomon* indicates that a court should look to rules of intestate succession to determine the claimant's reasonable expectation of inheriting, regardless of the presence of a will. *Solomon,* 540 F.2d at 791. In the instant case, Warren Seeds died intestate.

10. As explained below, the Court finds that Souletta Seeds Laufman, Warren Seeds' illegitimate daughter, would not have inherited from her father.

retirement; and civilian wages.[11] Based on the economic evidence, as further discussed by the Court above in its disposition of similar claims brought by the Wentzel family, the Court finds that these items should be valued annually as follows: $22,129.20 in basic pay; $4,800.00 in flight pay; $18,693.41 in military retirement; and $36,000.00 in civilian wages.[12] The total of these items, reduced to present value, represents Warren Seeds' lifetime monetary earnings.

2. *Deductions for Personal Consumption and Child Support.* The Court must deduct from this amount the money that Warren Seeds would have spent on himself or his children during his lifetime. Dr. Costen estimated that Warren Seeds would have personally consumed 67 percent of his income, based on an analysis of economic studies on personal consumption. The Court agrees with this estimate. It finds, therefore, that the amount of Jason Seeds' anticipated income equals 33 percent of Warren Seeds' earnings, less the amount of Warren Seeds' child support and college education payments for both Jason and Souletta Seeds Laufman, Warren's illegitimate daughter.[13] This amount should be reduced to present value.

Claimant Seeds seeks an additional $60,000 in lost inheritance, representing the value of Warren Seeds' home and savings at the time of his death. These benefits represent assets of the Seeds estate that Jason, as his father's sole heir, presumedly inherited upon Warren's death. The Court acknowledges that the parties did not address directly whether Jason actually acquired these assets. It stresses, however, that Jason Seeds, as claimant, bears the burden of showing a pecuniary loss. The Court finds that Jason has not proven that he lost these benefits and, accordingly, will not grant Jason's request

for $60,000 in lost inheritance from Warren Seeds' home and savings.

**D. Loss of Nurture and Guidance.** Jason may recover for the nurture and guidance he would have received from his father by showing that his father was fit to provide such nurture and guidance and in fact rendered such services prior to his death. *Solomon,* 540 F.2d at 788. The evidence adduced at trial shows that Warren Seeds was a hard-working, responsible man, fit to nurture and guide Jason. Although Warren did not have custody of his son, and in fact lived in a different city from Jason, the evidence indicates that Warren was a committed father involved in his son's life. Warren was prompt in his child support payments, frequently visited with Jason, engaged in special activities with Jason and took vacations with him. The Court therefore finds that Jason is entitled to compensation for the loss of the nurture and guidance Warren had provided him.

Based on the same evidence put forth by the Wentzel claimants, the Court finds the value of Warren Seeds' nurture and guidance to be $7,500 per year. This value, lower than that awarded to the Wentzel children, reflects the smaller amount of time Warren spent with Jason. *See Barrett v. United States,* 660 F.Supp. 1291, 1321 (S.D.N.Y. 1987) ("The court's award for loss of parental nurture and guidance to [a non-custodial child] must be limited, because she was in her mother's custody at the time of [her father's] death."). The Court therefore will award Jason Seeds $7,500 per year until his eighteenth birthday for lost nurture and guidance, reduced to present value.

### III. Claimant Souletta Seeds Laufman

Through her mother, Barbara Laufman, Souletta Seeds Laufman seeks compensation

---

11. Items such as military and private sector fringe benefits, to the extent claimed by Jason Seeds, have not been shown to add directly to the amount of property that Warren Seeds would have accumulated over his lifetime. Likewise, military allowances other than flight pay, to the extent claimed by Jason Seeds, have not been shown to be a reasonably expected component of Warren Seeds' military compensation.

12. The Court bases its finding that Warren Seeds would have entered the civilian work force at an annual salary of $36,000 on the testimony of Dr. Bart, petitioners' expert witness. Dr. Bart arrived at this figure after examining national studies discussing average starting salaries based on educational level, experience, age and gender.

13. Souletta's entitlement to compensation for child support and college education is discussed below.

for pecuniary losses suffered due to the death of Warren Seeds, contending that Warren was her father.[14] Barbara Laufman and Warren Seeds were never married. Souletta was six weeks old at the time of Warren's death, and Warren never had any contact with Souletta during this time period.

 **A. Paternity.** To recover for Warren Seeds' death, Souletta must demonstrate that she is a proper claimant under DOHSA, which permits a decedent's spouse, parent, child, or dependent relative to state a claim. 46 U.S.C.App. § 761. The law views a child born out of wedlock to be a "child" for the purpose of stating a DOHSA claim. *Middleton v. Luckenbach, S.S. Co., Inc.*, 70 F.2d 326, 330 (2d Cir.), *cert. denied*, 293 U.S. 577, 55 S.Ct. 89, 79 L.Ed. 674 (1934). Petitioners argue that Souletta has not proven that Warren Seeds was her father.

 DOHSA does not provide a specific standard for determining the paternity of a putative claimant, and most courts apply the most analogous state law to the paternity question in admiralty actions. *See, e.g., In re Indus. Trans. Corp.*, 344 F.Supp. 1311, 1314 (E.D.N.Y.1972) (holding court must apply state law when admiralty law is inconclusive or incomplete); *Risdal*, 291 F.Supp. at 360–61 (holding that state law determines illegitimate child's burden of proof in overcoming presumption that child's father is husband of child's mother). The parties to this action dispute the most analogous state law. Petitioners argue that the Court should look to laws governing the legitimization of children born out of wedlock for inheritance purposes or to laws governing an illegitimate child's right to child support payments. Claimant Laufman contends that state laws addressing paternity in wrongful death and workers' compensation actions are more applicable.

In a previous order denying petitioners' motion for summary judgment against claimant Laufman, this Court agreed with Laufman that the paternity standard established in Georgia wrongful death and workers' compensation laws governs the instant case. *In re Adventure Bound Sports, Inc.*, No.

CV489–274 (Aug. 10, 1992). In its order, this Court agreed with the reasoning articulated in *In re Industrial Transportation*, which held that the underlying purpose of laws governing a child's ability to receive compensation for his putative parent's death more closely mirrored the compensatory goals of DOHSA than did laws determining a child's right to inherit or receive support from a putative parent. *Industrial Trans.*, 344 F.Supp. at 1316–17. This Court also relied on a First Circuit holding that the "dependent relative" definition employed by the Longshoremen's and Harbor Worker's Compensation Act, which resembles the paternity standard set forth in Georgia workers' compensation law, is instructive in determining the paternity standard under DOHSA. *In re United States*, 418 F.2d 264, 271 (1st Cir. 1969). Georgia law bears out the logic of this Court's earlier holding; it clearly permits both legitimate and illegitimate children to recover in workers' compensation or wrongful death actions without requiring the type of "legitimization" necessary for inheritance purposes. *See Edenfield v. Jackson*, 251 Ga. 491, 306 S.E.2d 911, 915 (1983) (holding both legitimate and illegitimate children to be proper claimants under Georgia wrongful death statute); *Walden v. John D. Archbold Memorial Hosp.*, 197 Ga.App. 275, 398 S.E.2d 271, 273 (1990) (rejecting argument of decedent's siblings that illegitimate children should have no cause of action for wrongful death since they have no ability to inherit under intestacy statutes). Accordingly, this Court has defined the paternity standard in the instant case as whether the putative father, Warren Seeds, acknowledged Souletta as his daughter. *In re Adventure Bound Sports, Inc.*, No. CV489–274, at 10; *see also* O.C.G.A. § 34–9–13 (Supp.1992) (defining "child" in workers' compensation action to include "acknowledged children born out of wedlock"); O.C.G.A. § 51–4–2 (Supp.1992) (permitting children who can prove paternity to bring wrongful death action); *Edenfield*, 306 S.E.2d at 915 (permitting proven children, legitimate or illegitimate, to bring wrongful death actions under O.C.G.A. § 51–4–2); *American Mut. Liab. Ins. Co. v. Ho-*

---

**14.** For the sake of simplicity, the Court will refer to Souletta, a minor, as the claimant. In fact, Souletta's mother, Barbara Laufman, brings this action on Souletta's behalf.

*gan,* 91 Ga.App. 891, 87 S.E.2d 661, 664 (1955) (holding illegitimate child acknowledged by putative father stands on same footing as legitimate child under workers' compensation statute).

Petitioners argue that this Court should reconsider its analysis of the appropriate paternity standard. They present, however, no compelling argument to support such a reconsideration, suggesting only that a legal standard applicable in a summary judgment action does not apply to an action in which evidence has been adduced. This Court maintains that its prior holding accurately states the paternity standard operating in this DOHSA case, and requires claimant Laufman to prove only that Warren Seeds acknowledged his paternity of Souletta.

■ Claimant Laufman has met her burden of proving Seeds' acknowledgement of paternity. The specific circumstances of a case dictate whether "acknowledgement" has been obtained. *Patterson v. Liberty Mut. Ins. Co.,* 110 Ga.App. 23, 137 S.E.2d 549, 550 (1964); *Hogan,* 87 S.E.2d at 664. "[A]cknowledgment of paternity does not require a notary's seal or any other ritualistic proclamation," *Texas Employers' Ins. Ass'n v. Shea,* 410 F.2d 56, 61 (5th Cir.1969) (interpreting paternity standard similar to that used in Georgia); rather, Georgia courts have even accepted "constructive acknowledgment" to prove paternity, looking at the putative father's actions to infer an acknowledgment of the child. *See, e.g., Patterson,* 137 S.E.2d at 550; *Hogan,* 87 S.E.2d at 664.

Barbara Laufman, the mother of claimant Souletta Seeds Laufman, testified at trial that she met Warren Seeds in March, 1988, through her platonic roommate, William Angles, a military officer. At the time, Barbara lived across the street from Warren. Warren and Barbara began dating in April, 1988, and first had sexual relations in June, 1988. Barbara testified that she did not have sexual relations with anyone other than Warren from June, 1988, until late August, 1988, when she learned she was pregnant.

Barbara stated that she informed Warren of her pregnancy immediately. She testified that she refused Warren's offer of marriage because Warren proposed only after first asking Barbara to consider having an abortion. Barbara further testified that, around Christmas, 1988, Warren discussed child care and support obligations with Barbara, and requested that Barbara prepare paperwork concerning these obligations. Around April 28, 1989, after Souletta's birth, Barbara commenced child support proceedings against Warren in Bryan County, Georgia.

Major Andrew Milani, Warren's colleague, testified at trial that Warren stated that he was the father of Barbara's child. Major Milani also testified that Warren spoke of his obligation to support the child monetarily.

This Court finds the testimony of Barbara Laufman and Major Andrew Milani completely credible, and notes that this testimony is buttressed further by the consistent deposition testimony of Barbara's roommate, William Angles. This Court therefore finds that, before his death, Warren Seeds acknowledged his paternity of Souletta Seeds Laufman both to Souletta's mother, Barbara Laufman, and to his colleague, Major Andrew Milani. As a result, this Court holds that Souletta Seeds Laufman is Warren Seeds' child and may recover for his death under DOHSA.

■ **B. Loss of Support.** Souletta Seeds Laufman seeks compensation for the financial support that she contends Warren Seeds would have given her had he lived. Georgia law requires a parent to support a child born out of wedlock through the child's majority. O.C.G.A. § 19–7–24. At the time of Warren's death, Souletta's mother, Barbara Laufman, was in the process of establishing Warren as Souletta's father for the purpose of obtaining child support under section 19–7–24. After his divorce from Sandra Seeds Foster, Warren Seeds had responsibly fulfilled his child support obligations to his son, Jason Seeds. The Court finds, therefore, that Souletta had a reasonable expectation that Warren Seeds would fulfill his statutorily-imposed obligation to support her, as well.

The Court agrees with the parties that the guidelines for child support established by O.C.G.A. § 19–6–15 provide the best means of estimating the amount of support Souletta

had a reasonable expectation of receiving. Under these mandatory guidelines, *see* *Pruitt v. Lindsey*, 261 Ga. 540, 407 S.E.2d 750, 751 (1991), a parent with two children must pay between 23 and 28 percent of his or her gross income per pay period in child support. O.C.G.A. § 19–6–15(b)(5).[15] The Court estimates Souletta's lost child support at one-half of 25 percent of Warren Seeds' gross income per pay period. The evidence at trial established that Warren Seeds earned $2,901.45 per month at the time of his death, comprised of basic pay, special pay, and military allowances. Using the above calculation, the Court will award Souletta $360.00 per month until age eighteen, reduced to present value, in compensation for lost support from her father, Warren Seeds.

**C. Loss of College Education.** Claimant Laufman contends that, had Warren Seeds lived, he would have provided his daughter Souletta with a college education on top of his child support obligation. Souletta therefore seeks compensation for this additional pecuniary loss. As noted above, the parties' joint stipulations and the evidence at trial depict Warren Seeds as an achievement-oriented, responsible man and a committed father. The Court believes Warren would have provided Souletta with a college education. The Court agrees with the $30,000 value assigned to this loss by claimants' economic expert, Dr. Costen, and with Dr. Costen's reasoning that this amount should not be discounted since any interest earned on this amount will be offset by tuition increases from now until Souletta's college matriculation. The Court thus will award Souletta $30,000 for lost college education.

**D. Loss of Inheritance.** Claimant Souletta Seeds Laufman seeks compensation for loss of inheritance from her father, Warren Seeds. As discussed above, a claimant may receive compensation for lost inheritance under DOHSA by proving that the decedent, but for dying, would have accumulated property that would have passed to the claimant through intestate succession. *Solomon*, 540 F.2d at 790–91. Because the Court finds that Souletta could not have inherited from Warren under Georgia rules of intestate succession, it will not compensate Souletta for lost inheritance.

Georgia law permits a child born out of wedlock to inherit from her father only under specific circumstances: (1) if a court order legitimizes the child pursuant to O.C.G.A. § 19–7–22; (2) if a court order establishes the child as that of the father; (3) if the father admits paternity in a sworn statement; (4) if the father signed the child's birth certificate; (5) if the child demonstrates by clear and convincing evidence the father's paternity and intent to share his estate equally with the child; or (6) if evidence of genetic testing creates a presumption of paternity. O.C.G.A. § 53–4–4(c). The Court finds that Souletta has not demonstrated her reasonable expectation of inheriting from Warren Seeds, since she does not meet the requirements of any of the scenarios through which a child born out of wedlock may inherit from an intestate father.[16] Souletta, therefore, may not recover for lost inheritance.

**E. Loss of Nurture and Guidance.** Souletta Seeds Laufman seeks compensation for the parental nurture and guidance she lost upon the death of her father, Warren Seeds. Petitioners contest this claim as overly speculative, since Warren Seeds died very shortly after Souletta's birth and never had any contact with Souletta. The Court acknowledges that, to recover for lost nurture and guidance, a claimant must show the parent's fitness to nurture and guide and the parent's actual nurture and guidance during his or her lifetime. *Solomon*, 540 F.2d at 788. District courts have suspended the actual guidance requirement, however, in cases brought by a posthumous child, *see Brown v.*

---

15. In determining the percentage by which the parent's gross income is multiplied, the court must consider the total number of children supported by the parent rather than the number of children for which the specific support action is brought. *Batterson v. Groves*, 204 Ga.App. 52, 418 S.E.2d 373, 374 (1992).

16. The instant Order, finding Warren Seeds to be Souletta's father for the purpose of this DOHSA action, does not suffice as a court order establishing paternity under O.C.G.A. § 53–4–4(c), since this Order would not have existed had Warren Seeds lived.

*United States*, 615 F.Supp. 391, 400 (D.C.Mass.1985), *cause dismissed*, 795 F.2d 76 (1st Cir.1986), *cert. denied*, 479 U.S. 1058, 107 S.Ct. 938, 93 L.Ed.2d 989 (1987); *Hamilton v. Canal Barge Co.*, 395 F.Supp. 978, 986 (E.D.La.1975), or a child who was very young when the parent died. *See Boykin*, 835 F.Supp. at 286. In both cases, the courts held that a strict application of the actual guidance requirement would unfairly penalize a child who had never had the opportunity to receive nurture or guidance from the deceased parent. *Boykin*, 835 F.Supp. at 286 n. 16; *Brown*, 615 F.Supp. at 400. The *Brown* court aptly described this dilemma: "A strict application of [the *Solomon* court's] language to this case would have the absurd result of penalizing [the child] because she was deprived of her father's nurture for her entire childhood rather than a part thereof." *Brown*, 615 F.Supp. at 400. The *Boykin* and *Brown* courts therefore found a reasonable expectation of nurture and guidance based upon the deceased parent's actions towards his other children or upon the parent's character and general attitude towards children. *Boykin*, 835 F.Supp. at 286; *Brown*, 615 F.Supp. at 400.

In the instant case, the Court finds sufficient evidence indicating that Souletta reasonably could have expected to receive nurture and guidance from Warren Seeds. Evidence at trial demonstrated that Warren was a devoted father to his son, Jason, remaining involved in Jason's life despite Jason's residence in another city. Based on this evidence concerning Warren's character and his actions as a father, the Court believes that Warren would have recognized his parental responsibilities towards his daughter Souletta and developed a nurturing, guiding relationship with her. The Court finds Souletta entitled to recover for this lost parental nurture and guidance. Based on the evidence put forth at trial by the other claimants, the Court will award Souletta $7,500 per year until her eighteenth birthday for lost nurture and guidance, reduced to present value.

## IV. OFFSETS.

■ **A. Collateral Sources.** Petitioners contend that the Court should reduce the awards received by the Wentzel and Seeds claimants to reflect benefits received by these claimants from sources such as social security and the Veterans Administration. Claimants protest that these benefits come from collateral sources and that, under the collateral source doctrine, the Court cannot use these payments to offset claimants' recovery. The Court agrees with claimants, and will not offset their awards with the benefits claimants have received from these collateral sources.

■ The collateral source doctrine bars a court from reducing a tort award by amounts the plaintiff received from sources other than the tortfeasor. *A.H. Bull S.S. Co. v. Ligon*, 285 F.2d 936, 937 (5th Cir.1960). Courts have applied the doctrine to personal injury and wrongful death payments under the Federal Tort Claims Act, *United States v. Price*, 288 F.2d 448 (4th Cir.1961), the Federal Employer Liability Act, *Eichel v. New York Cent. R.R. Co.*, 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963), the Jones Act, *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525 (9th Cir.1962), and DOHSA, *Brown*, 615 F.Supp. 391.

The Fourth Circuit provided a helpful description of the collateral source doctrine:

[T]he broad rule seems to be that where the plaintiff receives from the tortfeasor payments specifically to compensate him for his injury, the tortfeasor need not pay twice for the same damages, and therefore such compensation payments should be taken into account in fixing tort damages. On the other hand, where the injured plaintiff's compensation comes from a "collateral source," it should not be offset against the sum awarded for the tort nor considered in determining that award.

*Price*, 288 F.2d at 449 (citations omitted). The essential test of whether a benefit will offset a plaintiff's recovery is whether that benefit's payments came from the tortfeasor. *Handelsman*, 307 F.2d at 534. In determining whether it should offset claimants' awards by the social security and Veterans Administration benefits received, therefore, this Court must consider whether those benefits created a "double payment" by petitioners.

Under the collateral source doctrine, the benefits received by claimants upon the decedents' deaths clearly do not impose a double liability upon petitioners. Petitioners, the owners of a vessel that the decedents chartered for a scuba diving trip, have absolutely no connection with any benefits received by the claimants from the government or the military upon the decedents' deaths. Petitioners are not liable for the social security and Veterans Administration benefits paid to claimants. The collateral source doctrine, therefore, prohibits the Court from reducing the petitioners' liability to claimants to accommodate these benefits.

Petitioners cite a Fourth Circuit case, *Mosley v. United States,* 538 F.2d 555 (4th Cir.1976), to support their argument that permitting claimants to recover an award that is not offset by these death benefits would contravene the DOHSA requirement that claimants recover only pecuniary losses. *Mosley* in fact supports the position taken by the Court. In *Mosley,* the Fourth Circuit offset a wrongful death award by the amount of Veterans Administration benefits received by the plaintiffs in a negligence action *brought against the Veterans Administration. Id.* at 561. The court's holding clearly focused on the fact that, if it did not offset the award, the Veterans Administration would face a double payment for the death: "To require the Government to recompense the estate for the destroyed earning power of the deceased and at the same time to give further succor by way of Veterans Administration benefits for the support and maintenance of the surviving family would indisputably let the estate recover from the United States double the loss of the veteran's prospective earnings." *Id.* Furthermore, at least one federal court has not found the collateral source doctrine to violate DOHSA's restriction of awards to pecuniary losses. *See Brown,* 615 F.Supp. at 398–99. This

Court likewise finds that claimants' awards should not be reduced by the amount of benefits they have received from sources other than petitioners.[17]

**B. Federal and State Income Taxes.** A wage earner's income tax is relevant to the amount of pecuniary loss suffered by the earner's dependents upon his or her death. *Norfolk & W. Ry. Co. v. Liepelt,* 444 U.S. 490, 494, 100 S.Ct. 755, 757–58, 62 L.Ed.2d 689 (1980). To estimate accurately the income lost by a DOHSA claimant, therefore, a court must reduce the decedent's gross income by the amount of taxes he or she would have paid. *Cox v. Northwest Airlines,* 379 F.2d 893, 896 (7th Cir.1967), *cert. denied,* 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968); *In re Marina Mercante Nicaraguense, S.A.,* 364 F.2d 118, 126 (2d Cir.1966), *cert. denied sub nom. Marina Mercante Nicaraguense, S.A. v. McAllister Bros., Inc.,* 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967); *Martinez,* 755 F.Supp. at 1007. The Court, therefore, will reduce its calculations of the earnings of Paul Wentzel and Warren Seeds, comprised of their military and private sector pay, entitlements, fringe benefits, and retirement, by twenty percent, a percentage agreed upon by both parties.

## V. REDUCTION TO PRESENT VALUE.

DOHSA strives to compensate a claimant for pecuniary benefits that the claimant would have enjoyed over the decedent's lifetime, but for the death of the decedent. Because these benefits are more valuable if received in a lump sum at the time of judgment than in installments over the course of a lifetime, they must be reduced to "present value" through the use of a discount rate. *See Pfeifer,* 462 U.S. at 536–37, 103 S.Ct. at 2550–51. "The calculation of damages suffered ... by the representative of a

---

17. The Court notes that while it cannot use these benefits to reduce the amount claimants would receive for their pecuniary losses, it can determine that the receipt of a specific benefit proves that a claimant did not experience a pecuniary loss *as to that benefit.* As discussed above, the Wentzel claimants seek recovery for loss of social security benefits. Their receipt of social security benefits indicates that they have incurred no

pecuniary loss. The Court's consideration of their receipt of these benefits, therefore, is not an offset against otherwise valid pecuniary losses. In contrast, claimant Seeds does not seek compensation for lost social security or Veterans Administration benefits. Seeds' receipt of these benefits cannot offset his pecuniary loss of child support payments.

deceased person involves four steps: estimating the loss of work life resulting from the ... death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value." *Culver v. Slater Boat Co.*, 722 F.2d 114 (Former 5th Cir.1983), *cert. denied sub nom. Reederei v. Byrd*, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842, *and cert. denied sub nom. St. Paul Fire & Marine Ins. Co. v. Culver*, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984).[18] A large portion of the trial on this case involved expert economic testimony on the proper discount rate for the Court to apply in calculating the present value of each decedent's lost income stream.

The United States Supreme Court has stated that the factors used by a court to estimate a decedent's lost income stream dictate the rate the court must use to discount that amount to present value. *Pfeifer*, 462 U.S. at 547, 103 S.Ct. at 2555–56. The *Pfeifer* Court condoned three methods of determining the present value of lost future income: (1) the "case by case" method; (2) the "below market" method; and (3) the "total offset" method. *Id.* at 547–50, 103 S.Ct. at 2555–57. A court using the "case by case" method considers all factors in its determination of a decedent's lost income stream: individual factors such as seniority and promotion gains; societal factors such as labor productivity rates; and price inflation. *Id.* at 547–48, 103 S.Ct. at 2555–56. The court then discounts this income stream by the after-tax market interest rate. *Id.* A court using the "below market" method considers the individual and societal factors but not price inflation; it thus must remove inflationary considerations from its discount rate, using an interest rate that falls below the market rate. *Id.* at 548–49, 103 S.Ct. at 2556–57. A court using the "total offset" method considers only the individual factors contributing to the lost income stream; this growth rate is viewed to completely offset the market interest rate, leaving a discount rate of zero. *Id.* at 549–50, 103 S.Ct. at 2556–57.

In *Culver*, the Former Fifth Circuit held that factfinders must use the "below market" method to calculate the present value of lost future income. 722 F.2d at 122. This Court believes that the United States Supreme Court overruled the *Culver* mandate in *Monessen S.W. Ry. Co. v. Morgan*, 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988), leaving this Court, as factfinder in the instant case, free to select any of the three methods set forth in *Pfeifer*. In *Monessen*, the Supreme Court held that a state supreme court's application of the "total offset" method as a matter of law "improperly took from the jury the essentially factual question of the appropriate rate at which to discount appellee's ... award to present value." *Monessen*, 486 U.S. at 342, 108 S.Ct. at 1846. The *Monessen* Court stressed an earlier Supreme Court prohibition against "'subject[ing] the jury's estimate to ... rigid mathematical limitatio[n].'" *Id.* at 342, 108 S.Ct. at 1846 (quoting *Louisville & Nashville Ry. Co. v. Holloway*, 246 U.S. 525, 528, 38 S.Ct. 379, 380–81, 62 L.Ed. 867 (1918)).

The Eleventh Circuit has not directly addressed whether the *Monessen* decision overrules its *Culver* requirement that factfinders employ the below market discount method. The Eleventh Circuit has noted, however, that *Monessen* casts doubt upon the *Culver* mandate, *Ageloff v. Delta Airlines*, 860 F.2d 379, 389 (11th Cir.1988), and the Fifth Circuit has stressed that, under *Monessen*, the factfinder must select the discount rate to be applied. *Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649, 657 (5th Cir.1989). The only Eleventh Circuit district court to consider this particular question held that *Culver* has been overruled. *See Purdy v. Belcher Refining Co.*, 781 F.Supp. 1559, 1563 (S.D.Ala. 1992) ("[T]he Supreme Court has held that, in effect, one of three methods utilized by the trial court shall be applied by the appellate court if sufficiently supported, thus[ ] overruling the *Culver* mandatory requirement of a below-market-discount method."). This Court agrees that *Monessen* overrules *Culver*. By rejecting a state's decision to man-

---

**18.** As explained below, the Court concludes that the United States Supreme Court has overruled the *Culver* dictate of one particular method of discounting to present value. This conclusion does not, however, weaken *Culver*'s instructive general discussion of discounting to present value.

date the "total offset" method, the *Monessen* Court implicitly rejected the Eleventh Circuit's decision to mandate the "below market" method. As a result, this Court will not be bound to the "below market" method and, instead, will look to all three methods for the best way of discounting the decedents' lost stream of income.

■ Based on the nature of the expert economic testimony adduced at trial, the Court finds the "case-by-case" method most appropriate for calculating damages in this action. The expert witnesses put forth by each side used price inflation as a factor in formulating a growth rate by which to estimate the decedents' lost stream of income. Dr. Costen, the claimants' expert economist, stated that he considered, among other factors, long-term economic cycles in computing the growth rate. Dr. Bart, the petitioners' expert economist, stated that she relied on the short-term consumer price index in her growth rate calculation. In *Pfeifer*, the Supreme Court held price inflation to be an appropriate factor *only* in the "case by case" method. *Pfeifer*, 462 U.S. at 547–50, 103 S.Ct. at 2555–57. Since the evidence at trial supports a discount rate calculation only under this method, the Court will employ the "case by case" method in its calculations. Based on the expert testimony, the Court finds a 6% growth rate and a 5% discount rate appropriate in this case and will reduce the total award to present value according to these figures.

## VI. CLAIM OF SEEDS ESTATE FOR PAIN AND SUFFERING.

■ Alongside the DOHSA claims brought by the Seeds claimants, the estate of Warren Seeds brings a claim for pain and suffering, asserting that Warren Seeds was alive and conscious for some time after the accident. A claimant may not recover for the decedent's pain and suffering under DOHSA; he or she may, however, seek pain and suffering damages pursuant to the governing state law. *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1092 (5th Cir.1988) (citing *Solomon*, 540 F.2d at 792). General admiralty law and Georgia law distinguish claims brought by an individual for the wrongful

death of another and claims brought by an estate for pain and suffering endured by the decedent. *Miles v. Melrose*, 882 F.2d 976, 985 (5th Cir.1989); *Smith v. Memorial Medical Ctr., Inc.*, 208 Ga.App. 26, 430 S.E.2d 57, 58 (1993). Georgia law permits an estate to recover damages for pain and suffering if it proves that the decedent suffered physical or mental pain and suffering, such as fright or shock, attended with the physical injury that caused the death. *Monk v. Dial*, 212 Ga. App. 362, 441 S.E.2d 857, 859 (1994).

■ To support its claim for pain and suffering damages, the Seeds estate points to evidence adduced during the liability phase of this bifurcated action. In that phase, Captain Sheppard, a member of the diving expedition, testified that he asked Warren Seeds to squeeze his hand after retrieving him onto the boat. Sheppard stated that Seeds responded to this request. In addition, Seeds' death certificate indicates that he died some time after the accident. The estate uses this evidence to infer that Seeds was alive after the accident, conscious for some unspecified time after the accident, and resultingly experienced pain and suffering for which the estate should be compensated.

Petitioners contest this claim on two grounds. First, they argue that the estate has not properly brought a pain and suffering claim before the Court, but rather raised the claim solely at the damages phase of the action. Second, they argue that the Court may not consider the testimony of Captain Sheppard, since this testimony was adduced during the first phase of the trial during which petitioners had the opportunity to cross-examine Sheppard only as to the issue of liability.

The Court agrees with petitioners that the Seeds estate has not properly asserted a claim for pain and suffering in this action. In his initial response to petitioners' monition, the estate's administrator made a claim "for the compensation/damages allowable under the *Death on the High Seas Act*.... Pursuant to this statute, the Claimant is beneficiary of any cause of action which may be brought under the *Death on the High Seas Act* by the Administrator of Warren Seed's [sic] estate." (Cl. of John MacLean as

Admin. and Personal Repr. of the Estate of Warren R. Seeds at 2.) The administrator did not refer in this response to any potential claims, such as pain and suffering, lying outside the realm of DOHSA. Later submissions by the estate referred to pain and suffering as an element of damages under DOHSA. Only in the most recent proposed findings of fact and conclusions of law has the estate argued for these damages under a separate body of law. Because the estate did not properly raise the pain and suffering claim, the Court will not award damages on this ground.

## VII. CONTRIBUTORY NEGLIGENCE.

 In the liability phase of this action, the Court held that Paul Wentzel and Warren Seeds bore 33⅓ percent of the responsibility for the accident that caused their deaths. The Court therefore will reduce the overall award to the claimants by 33⅓ percent.

## VIII. PREJUDGMENT INTEREST.

Claimants seek an award for prejudgment interest covering the time period between the date of the accident and the date of judgment. They value this award at five percent of the total reduced pecuniary benefit lost, relying on expert testimony that five percent equals the interest rate on a reasonable and safe investment. Petitioners challenge both the appropriateness of a prejudgment interest award in the instant case, and the five percent value suggested by claimants.

 The Court finds that prejudgment interest is appropriate in this case, and will award it. Courts may award prejudgment interest in DOHSA actions at their discretion. *Solomon,* 540 F.2d at 794; *Stiles,* 268 F.2d at 404–06; *Shaw v. Grumman Aerospace Corp.,* 593 F.Supp. 1066, 1074 (S.D.Fla.1984), *aff'd,* 778 F.2d 736 (11th Cir. 1985), *and cert. denied,* 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988). Without a prejudgment interest award, a claimant receiving judgment several years after the decedent's death would not receive the full value of the loss; awarding prejudgment interest, therefore, is the general rule absent a

showing of good cause. *Stiles,* 268 F.2d at 405. Federal courts have articulated several exceptional circumstances that justify the denial of prejudgment interest, including an extraordinary delay between the decedent's death and the claimant's commencing or prosecuting the claim; in cases of mutual fault, uncertainty over the extent of damages or ultimate liability; and other peculiar circumstances that might merit an award of less than full compensation to the claimant. *First Nat'l Bank of Chicago v. Material Serv. Corp.,* 597 F.2d 1110, 1121 (7th Cir. 1979); *see also Shaw,* 593 F.Supp. at 1074 (refusing to award prejudgment interest where two years lapsed between accident and filing of claim, the parties disputed liability, and the action involved complex factual and legal issues).

In the case at bar, no exceptional circumstances appear to demand that claimants receive less than the full value of their loss. Claimants filed this action promptly; the judicial delays caused by the complex nature of this action certainly do not merit reducing claimants' award. The Court accounts for the decedent's mutual fault by reducing the award by the percentage of this contributory negligence; no need exists to further reduce claimants' award by refusing to include otherwise valid prejudgment interest. The Court therefore will award claimants five percent of the judgment in prejudgment interest.

## IX. CONCLUSION.

Based on the above Findings of Facts and Conclusions of Law, and as further broken down in the following Appendix,

**IT IS HEREBY ORDERED** that the claimants be and are **AWARDED** damages as follows:

| | |
|---|---|
| Patricia Wentzel: | $165,210.65 |
| Matthew Wentzel: | $250,499.93 |
| Justin Wentzel: | $261,645.53 |
| Jason Seeds: | $152,611.60 |
| Souletta Seeds Laufman: | $135,927.74 |
| Estate of Warren Seeds: | $ –0– |

### APPENDIX

(All figures are reduced to present value where required.)

I. *Claimant Patricia Wentzel*
Lost Military Wages $ 85,386.63

Lost Military Retirement 50,201.26
Lost Civilian Income 140,082.02
Lost Services 18,595.27
Funeral Expenses 3,557.00

$297,822.18

LESS:
Federal and State Taxes 55,133.98
Personal Consumption 48,517.90
Contributory Negligence 64,723.43

$129,446.87

TOTAL $165,210.65
Includes prejudgment interest
of 5% from 6/4/89 to 6/4/94.

II. *Claimant Matthew Wentzel*

Lost Military Wages $ 85,386.62
Lost Military Retirement 50,201.27
Lost Civilian Income 140,082.02
Lost Services 18,595.27
Lost Nurture & Guidance 103,796.58

$398,061.76

LESS:
Federal and State Taxes 55,133.98
Personal Consumption 48,517.90
Contributory Negligence 98,136.63

$196,273.25

TOTAL $250,499.93
Includes prejudgment interest
of 5% from 6/4/89 to 6/4/94.

III. *Claimant Justin Wentzel*

Lost Military Wages $ 85,386.62
Lost Military Retirement 50,201.27
Lost Civilian Income 140,082.02
Lost Services 18,595.27
Lost Nurture & Guidance 116,895.87

$411,161.05

LESS:
Federal and State Taxes 55,133.98
Personal Consumption 48,517.90
Contributory Negligence 102,503.05

$205,006.12

TOTAL $261,645.53
Includes prejudgment interest
of 5% from 6/4/89 to 6/4/94.

IV. *Claimant Jason Seeds*

Lost Support $ 43,779.15
Lost College Education 30,000.00
Lost Inheritance * 47,670.61
Lost Nurture & Guidance 57,913.01

$179,362.77

LESS:

Contributory Negligence 59,787.59

$119,575.18

TOTAL $152,611.60
Includes prejudgment interest
of 5% from 6/4/89 to 6/4/94.
* Calculation of Lost Inheritance Award:
Lost Basic Pay $231,020.85
Lost Flight Pay 50,110.26
Lost Military Retirement 187,892.41
Lost Civilian Income 399,031.80

$868,055.32

Less:
Jason's Support 56,696.00
Jason's College 30,000.00
Souletta's Support 64,800.00
Souletta's College 30,000.00
Federal & State Taxes 173,611.06
Personal Consumption 465,277.65

TOTAL: $ 47,670.61

V. *Claimant Souletta Seeds Laufman*

Lost Support $ 42,082.51
Lost College Education 30,000.00
Lost Nurture & Guidance 87,671.90

$159,754.41

LESS:
Contributory Negligence 53,251.47

$106,502.94

TOTAL $135,927.74
Includes prejudgment interest
of 5% from 6/4/89 to 6/4/94.